UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------------x
RICHARD DOWNING,                                    :
                  Plaintiff,          :
v.                                                  :
                                            :          **OPINION AND ORDER**
PHELPS MEMORIAL HOSPITAL;                           :
NORTHWELL HEALTH, INC.; BARUCH                      :          16 CV 1114 (VB)
BERZON, M.D.; SANDRA CARNICIU, M.D.;                :
and THOMAS LEE, M.D.,                               :
                  Defendants.          :
--------------------------------------------------------------x

Briccetti, J.:

      Plaintiff Richard Downing brings this action against defendants Phelps Memorial

Hospital ("Phelps"), Northwell Health, Inc., Dr. Baruch Berzon (collectively, the "Phelps

defendants"), Dr. Sandra Carniciu, and Dr. Thomas Lee, asserting claims for medical

malpractice.[1]

      Before the Court are defendants' motions for summary judgment.  (Docs. ##257, 266,

271, 274).

      For the following reasons, the motions are DENIED.[2]

      The Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(a).

---

[1]    By a Stipulation and Order of Discontinuance dated February 3, 2020, defendant Tappan Zee Constructors, LLC ("TZC"), settled with plaintiff and withdrew its cross-claims against the remaining defendants.  (See Docs. ##302, 303).

[2]    In the alternative, defendant Dr. Lee requests a hearing on the admissibility of plaintiff's experts' opinions.  (See Doc. #266).  That request was joined by Dr. Carniciu in her reply brief. (See Doc. #305).  For the below reasons, Drs. Lee and Carniciu's request for a hearing is DENIED WITHOUT PREJUDICE.

**BACKGROUND**

The parties have submitted memoranda of law, declarations with exhibits, and statements of material fact pursuant to Local Civil Rule 56.1, which together reflect the following factual background.

I.    The Injury

Plaintiff worked as a deck hand aboard the Tug Prospector (the "tug") at the new Tappan Zee Bridge construction site on the Hudson River.

On July 8, 2015, the tug captain told plaintiff to board the Material Barge (the "barge") to help move the barge to a mooring. Between 3:00 and 4:00 p.m. that day, plaintiff was handling heavy mooring lines and felt a "pop or a stabbing feeling" in the back of his neck, that extended to his scapula. (Doc. #295 ("McDonald Decl.") Ex. 13 ("Pl. Dep.") at 61). Plaintiff immediately felt weak and experienced excruciating pain. After twenty minutes, plaintiff was assisted off the tug by another deck hand and was transferred from the barge to a crew boat to be taken to location in Tarrytown, New York, for medical care.

At that location, a physician's assistant evaluated plaintiff and incorrectly diagnosed him with dehydration and an electrolyte imbalance. (See Pl. Dep. at 74). Because plaintiff had been trained as an emergency medical technician, he believed he was suffering from a spinal injury and requested to be taken to a trauma center. He was then taken by ambulance to Phelps, which plaintiff understood was not a trauma hospital. Plaintiff's transport to Phelps took seven to eight minutes.

II.     Medical Treatment

Plaintiff arrived at Phelps between 5:09 and 5:13 p.m.[3]  He was seen by a triage nurse at

5:17 p.m., for an assessment that took ten minutes.  Plaintiff told the nurse he was experiencing

mid-back pain and rated the pain at nine-out-of-ten intensity.  (See Phelps Pl. Medical Records at

10).  The triage nurse assigned plaintiff an acuity level of two for pain, which is assigned on a

scale of one to four, one being the most emergent.  (See Berzon Dep. at 41–42).  Plaintiff was

evaluated by a staff nurse about twenty minutes later.

Dr. Berzon, a doctor in the hospital's emergency room, was asked to prescribe plaintiff

pain medication before he performed his assessment of plaintiff.  At the time, Dr. Berzon was

seeing another patient who, according to Dr. Berzon, had a more serious presentation.  (See

Berzon Dep. at 23).  Dr. Berzon prescribed the medication, and at 6:16 p.m., plaintiff was given

an injection of Toradol.

Plaintiff testified that about fifteen minutes after receiving the Toradol injection, and

more than one hour after he arrived at Phelps, he felt a "warm sensation" in his chest that

extended down his legs to his toes.  (Pl. Dep. at 93, 124).[4]  Plaintiff suspected he was developing

paralysis.  Plaintiff complained to the nurse about his loss of sensation, and the nurse informed

Dr. Berzon of same just before 6:58 p.m.  (See Phelps Pl. Medical Records at 3, 5, 16, 34).

At 6:58 p.m., Dr. Berzon performed a physical examination of plaintiff's spine, and

found vertebral tenderness.  (See Berzon Dep. at 54, 113–115).  Dr. Berzon also found sensory

---

[3]     Defendants claim plaintiff arrived at 5:12 or 5:13 p.m. (see Doc. #274 ("Holmes Aff.")
Ex. F ("Berzon Dep.") at 41; Holmes Aff. Ex. M ("Phelps Pl. Medical Records") at 10), but
plaintiff testified that he arrived earlier.  (Pl. Dep. at 116).

[4]     Dr. Berzon testified that "between 20 and 40 minutes" passed between plaintiff's
injection of Toradol and the onset of his neurological symptoms."  (Berzon Dep. at 56).

deficit from plaintiff's abdomen to his feet, and found plaintiff's rectal tone to be decreased.  Dr. Berzon suspected plaintiff had "traumatic cord compression."  (Id. at 58).

At 7:02 p.m., Dr. Berzon ordered blood work, X-rays, and MRI studies of plaintiff's thoracic and lumbar spine.  (See Phelps Pl. Medical Records at 10–11).  Dr. Berzon also ordered steroids and a neurological consultation.  Dr. Berzon then told plaintiff he would receive a neurological consultation and imaging.  (See Pl. Dep. at 127–29).

At 7:10 p.m., Dr. Berzon telephoned the on-call neurologist, Dr. Carniciu.  (See Holmes Aff. Ex. G ("Carniciu Dep.") at 19–20).  Dr. Berzon told Dr. Carniciu that plaintiff complained of back pain, that he was paralyzed from the waist down, and that he had a spontaneous erection (priapism), which, to Dr. Carniciu, indicated severe spinal cord damage.  (See id. at 23).  Dr. Carniciu then drove to Phelps.

At approximately 7:20 p.m., Dr. Carniciu examined plaintiff.  Dr. Carniciu's diagnosis was "acute spinal cord injury posttraumatic and further localized to mid-high thoracic spinal cord level, T4 thoracic spinal cord."  (Carniciu Dep. at 42).  Dr. Carniciu attributed the diagnosis to an "acute herniated disk," which she testified was her first differential diagnosis and which she believed to be the most common cause of plaintiff's symptoms.  (Id. at 43).  According to Dr. Carniciu, bleeding was within the differential diagnosis.  (See id. at 46–47).

Both Drs. Berzon and Carniciu were concerned with acute spinal cord compression. Following her assessment, Dr. Carniciu believed the on-call neurosurgeon should be consulted.

Between 7:40 and 7:45 p.m., Dr. Carniciu spoke with Dr. Lee, the on-call neurosurgeon, by telephone for five to ten minutes.[5]  Dr. Carniciu told Dr. Lee that plaintiff was undergoing X-rays and that MRIs had also been ordered.  She shared her diagnosis with Dr. Lee—that

---

[5]    Lee testified that Dr. Carniciu's call was not a formal request for consultation.  (See Holmes Aff. Ex. H ("Lee Dep.") at 81, 84, 85, 87–90).

plaintiff was most likely suffering from upper-mid thoracic spinal cord compression due to a herniated disc.  (See Carniciu Dep. at 49).  Dr. Lee believed surgery for such diagnosis should be done at a tertiary care hospital, such as Westchester Medical Center ("WMC"), because plaintiff required CAT scans, MRIs, and other tests that are generally not conducted at night at a community hospital like Phelps, in addition to neuromonitoring, a surgical team, surgical implants, and other personnel and resources.  (See id. at 50–52, 55, 165; Lee Dep. at 30–31).  Drs. Lee and Carniciu agreed that a transfer to a tertiary care hospital should take place as quickly as possible, and thus, any tests or imaging, such as MRIs, should be done at WMC rather than at Phelps.  (See Carniciu Dep. at 55–60; Lee Dep. at 29–30, 35).[6]

Dr. Carniciu conveyed to Dr. Berzon the recommendation to transfer plaintiff to WMC.  (Carniciu Dep. at 56).  Dr. Berzon signed the transfer order and chart at 8:10 p.m.  (See Berzon Dep. at 85–86; Phelps Pl. Medical Records at 6).  As a result, plaintiff did not have MRIs taken at Phelps.

At 8:00 p.m. Phelps staff began to call WMC to effectuate plaintiff's transfer, but did not reach WMC until 8:30 p.m.  (See Holmes Aff. Ex. S ("Phelps Call Center Records") at 2).  At around 8:45 p.m., Dr. Jarvis, a physician in the spine surgery division at WMC, spoke with Dr. Berzon and agreed to accept plaintiff.  (See Phelps Pl. Medical Records at 22).  WMC sent an ambulance to Phelps to transfer plaintiff, which arrived around 9:18 p.m.  Plaintiff left Phelps for WMC shortly thereafter.

Plaintiff arrived at WMC at approximately 9:53 p.m.  WMC performed an MRI on plaintiff at around 10:45 p.m., which was completed at approximately 12:30 a.m. the following

---

[6]     The MRI machine at Phelps was occupied by other patients between 6:52 and 9:23 p.m.  (See Doc. #258 ("Newman Decl.") Ex. F).  The parties dispute whether plaintiff could have had an MRI taken during that window of time.

day, July 9, 2015.  The MRI showed that plaintiff was suffering from an epidural bleed, which was pressing on his spinal cord at the thoracic level.

Plaintiff was brought into the operating room at WMC at 3:29 a.m. and surgery commenced at 4:40 am.  Plaintiff's pre-operative diagnosis was "compressive spinal cord lesion with acute paralysis."  (Newman Decl. Ex. H at 211).  Surgery was performed via posterior approach and plaintiff's spinal cord was decompressed during the surgery.

Despite the surgery, plaintiff remained paralyzed.

## DISCUSSION

I.    Legal Standard

The Court must grant a motion for summary judgment if the pleadings, discovery materials before the Court, and any affidavits show there is no genuine issue as to any material fact and it is clear the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).[7]

A fact is material when it "might affect the outcome of the suit under the governing law . . . .  Factual disputes that are irrelevant or unnecessary" are not material and thus cannot preclude summary judgment.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

A dispute about a material fact is genuine if there is sufficient evidence upon which a reasonable jury could return a verdict for the non-moving party.  See Anderson v. Liberty Lobby, Inc., 477 U.S. at 248.  The Court "is not to resolve disputed issues of fact but to assess whether there are any factual issues to be tried."  Wilson v. Nw. Mut. Ins. Co., 625 F.3d 54, 60 (2d Cir. 2010).  It is the moving party's burden to establish the absence of any genuine issue of material fact.  Zalaski v. City of Bridgeport Police Dep't, 613 F.3d 336, 340 (2d Cir. 2010).

---

[7]    Unless otherwise indicated, case quotations omit all internal citations, quotations, footnotes, and alterations.

If the non-moving party fails to make a sufficient showing on an essential element of his case on which he has the burden of proof, then summary judgment is appropriate.  Celotex Corp. v. Catrett, 477 U.S. at 323.  If the non-moving party submits "merely colorable" evidence, summary judgment may be granted.  Anderson v. Liberty Lobby, Inc., 477 U.S. at 249–50.  The non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts, and may not rely on conclusory allegations or unsubstantiated speculation." Brown v. Eli Lilly & Co., 654 F.3d 347, 358 (2d Cir. 2011).  The mere existence of a scintilla of evidence in support of the non-moving party's position is likewise insufficient; there must be evidence on which the jury could reasonably find for him.  Dawson v. County of Westchester, 373 F.3d 265, 272 (2d Cir. 2004).

On summary judgment, the Court construes the facts, resolves all ambiguities, and draws all permissible factual inferences in favor of the non-moving party.  Dallas Aerospace, Inc. v. CIS Air Corp., 352 F.3d 775, 780 (2d Cir. 2003).  If there is any evidence from which a reasonable inference could be drawn in favor of the non-moving party on the issue on which summary judgment is sought, summary judgment is improper.  See Sec. Ins. Co. of Hartford v. Old Dominion Freight Line, Inc., 391 F.3d 77, 82–83 (2d Cir. 2004).

In deciding a motion for summary judgment, the Court need only consider evidence that would be admissible at trial.  Nora Beverages, Inc. v. Perrier Grp. of Am., Inc., 164 F.3d 736, 746 (2d Cir. 1998).

II.    Medical Malpractice

Defendants argue they are entitled to summary judgment on plaintiff's claims for medical malpractice.

The Court disagrees.

In this case, there are eight medical experts who disagree as to whether defendants departed from the standard of care owed to plaintiff, and, if so, whether such departures contributed to, or caused, plaintiff's ultimate outcome of paralysis.[8]  Assuming without deciding whether the experts are qualified, there are material factual disputes not suited for resolution by summary judgment.

A.    Legal Standard

As an initial matter, all parties assert New York substantive law applies to plaintiff's medical malpractice claims, and the Court agrees.  See Cargo Partner AG v. Albatrans Inc., 207 F. Supp. 2d 86, 93 (S.D.N.Y. 2002), aff'd, 352 F.3d 41 (2d Cir. 2003) ("[W]here the parties have agreed to the application of the forum law, their consent concludes the choice of law inquiry.").

Under New York law, "[t]he requisite elements of proof in a medical malpractice action are a deviation or departure from accepted practice and evidence that such departure was a proximate cause of injury or damage."  Estiverne v. Esernio–Jenssen, 581 F. Supp. 2d 335, 350 (E.D.N.Y. 2008) (quoting Wiands v. Albany Med. Ctr., 29 A.D.3d 982, 983 (2d Dep't 2006)). "[I]n order to make out a prima facie case for medical malpractice, plaintiff must allege that (1) the physician owed a duty of care to the plaintiff; (2) the physician breached that duty by deviating from accepted medical practice; and (3) the alleged deviation proximately caused plaintiff's injuries."  Flemming v. Velardi, 2003 WL 21756108, at *3 (S.D.N.Y. July 30, 2003).

"In moving for summary judgment, each set of defendants must make a prima facie showing that they 'did not depart from good and accepted medical practice or that any departure did not proximately cause plaintiff's injuries.'"  Doane v. United States, 369 F. Supp. 3d 422,

---

[8]    Because TZC is no longer a party to this action, and because "[TZC] experts have never been disclosed by Plaintiff as experts intended to offer opinions against the medical defendants," the Court declines to consider on summary judgment the opinions of TZC experts Drs. Terrance Baker, Bruce Tranmer, and Alexander Merkler.  (Doc. #304 at 1).

446 (N.D.N.Y. 2019) (citing Ducasse v. N.Y.C. Health & Hosps. Corp., 148 A.D.3d 434, 435 (1st Dep't 2017)).

 "In order to rebut this showing and survive summary judgment, a plaintiff 'must submit evidentiary facts or materials,' typically through expert testimony, and 'demonstrate the existence of a triable issue of fact.'"  Doane v. United States, 369 F. Supp. 3d at 446–47 (citing Alvarez v. Prospect Hosp., 68 N.Y.2d 320, 324 (1986)).  "A plaintiff's expert testimony need only rebut the prima facie showing made by the defendants."  Id. at 447 (citing Stukas v. Streiter, 83 A.D.3d 18, 30 (2d Dep't 2011)).  "Summary judgment is not appropriate in a medical malpractice action where the parties adduce conflicting medical expert opinions.  Such credibility issues can only be resolved by a jury."  Feinberg v. Feit, 23 A.D.3d 517, 519 (2d Dep't 2005); see also Doane v. United States, 369 F. Supp. 3d at 449.  Indeed, when experts disagree about whether a diagnostic delay affected prognosis, there exists a genuine issue of material fact that should be presented to a jury.  See Polanco v. Reed, 105 A.D.3d 438, 442 (1st Dep't 2013).

In addition, under New York law, hospitals are vicariously liable for the physicians who provide care to their emergency room patients, provided that such a patient has not entered the hospital in order to receive treatment from a specific physician.  Lorenz v. Managing Dir., St. Luke's Hosp., 2010 WL 4922267, at *11 (S.D.N.Y. Nov. 5, 2010), report and recommendation adopted, 2010 WL 4922541 (S.D.N.Y. Dec. 2, 2010) (citing Schiavone v. Victory Mem'l Hosp., 292 A.D.2d 365, 366 (2d Dep't 2002)).

B.    Application

Plaintiff's theory of medical malpractice liability is that each of the defendants departed from the standard of care owed to plaintiff, and these departures contributed to plaintiff's

paralysis when defendants engaged in conduct delaying plaintiff's surgery.  Specifically, plaintiff

argues the following delays constitute a departure from the standard of care:  (i) Dr. Berzon's

failure to timely evaluate plaintiff; (ii) Dr. Berzon's request for a neurological consultation,

rather than a neurosurgical consultation; (iii) the failure to promptly perform MRI imaging at

Phelps; (iv) Drs. Carniciu and Lee's decision to transfer plaintiff from Phelps to WMC; (v) Drs.

Carniciu and Lee's failure to accurately diagnose plaintiff at Phelps given the lack of MRI

imaging and the failure of Dr. Lee to examine plaintiff in person; and (vi) the failure to perform

appropriate surgical intervention at Phelps.  In response, defendants assert their conduct fell

within the bounds of the standard of care owed to plaintiff, and that such conduct did not

proximately cause plaintiff's paralysis.  Each defendant's conduct is considered in turn below.

        1.    <u>Dr. Berzon</u>

The Phelps defendants argue there is no genuine dispute of material fact regarding

whether Dr. Berzon's treatment of plaintiff fell below the standard of care.

The Court disagrees.

Plaintiff's emergency department expert, Dr. Diane M. Sixsmith, insists Dr. Berzon's

conduct fell below the accepted standard of care.  She asserts Dr. Berzon should have examined

plaintiff shortly after he arrived in the emergency room, and a "stat" MRI should have been

ordered at approximately 5:40 p.m., all of which could have been completed within an hour.

(<u>See</u> McDonald Decl. Ex. 1 ("Sixsmith Aff.") at 5).  Indeed, Dr. Sixsmith noted "it would have

been extremely imprudent to wait for those neurological deficits to order the MRI."  (<u>Id</u>. at 6).

Further, she believes cancelling the MRI at Phelps was a departure from the standard of care

because the MRI "was not done until more than 4 hours later after [plaintiff's] transfer to

WMC."  (<u>Id</u>.).  In addition, plaintiff's expert Dr. Michael J. Murphy claims Dr. Berzon should

have initiated a consult with a spinal surgeon, rather than a neurologist.  (McDonald Decl. Ex. 5

("Murphy Report") at ECF 10–11).[9]

Dr. Berzon's experts disagree.  Dr. Dan Wiener, an emergency medical physician,

testified that "Dr. Berzon acted within the standard of care with regard to the timing of his

examination of [plaintiff]."  (Holmes Aff. Ex. U ("Wiener Aff.") ¶ 13).  Further, Dr. Wiener

opined that Dr. Berzon promptly obtained a neurological consult for plaintiff, and then promptly

effectuated plaintiff's transfer to WMC.  (See id. ¶ 15).  Dr. Wiener concluded Dr. Berzon's

conduct fell "within the standard of care."  (Id. ¶ 16).

Dr. George Vincent DiGiacinto, a neurosurgeon, echoed Dr. Wiener's assessment.  He

too stated Dr. Berzon's conduct was within "good and accepted practice," and met "the standard

of care."  (See Holmes Aff. Ex. V ("DiGiacinto Aff.") ¶ 5).  Indeed, Dr. DiGiacinto observed

that plaintiff "very quickly went from ambulatory with normal neurological function to a

complete loss of neurological function with loss of rectal tone, [priapism] and loss of motor and

sensory function," which made it "essentially impossible that any intervention in any reasonable

amount of time could have resulted in a reversal of this neurological deficit."  (Id. ¶ 6).

According to Dr. DiGiacinto, plaintiff's symptoms "indicated end stage compression and even if

surgery had been undertaken [earlier], the chance of any return of function was next to none."

(Id. ¶ 7).

These competing expert opinions spotlight a material factual dispute respecting whether

Dr. Berzon's conduct fell below the standard of care and contributed to plaintiff's paralysis.

Accordingly, summary judgment on plaintiff's medical malpractice claim as to Dr. Berzon and

the Phelps defendants under a theory of vicarious liability must be denied.

---

[9]     "ECF __" refers to page numbers automatically assigned by the Court's Electronic Case
Filing system.

2.      Dr. Carniciu

Dr. Carniciu argues there are no material facts in the record to support plaintiff's claim that Dr. Carniciu's conduct fell below the standard of care, and, even if certain delays in treatment could constitute a deviation from the standard, the record is devoid of facts that would allow a jury reasonably to conclude Dr. Carniciu's conduct proximately caused plaintiff's paralysis.

The Court disagrees.

Plaintiff's expert Dr. Stephen Conway testified that Dr. Carniciu "erroneously concluded that [plaintiff] had a condition that could not be treated at Phelps without obtaining the appropriate imaging," and that Dr. Carniciu, in consultation with Dr. Lee, assumed that plaintiff's "neurological condition was due to a thoracic disk herniation—and that surgery would require an anterior approach and expertise and surgical hardware the hospital did not have." (McDonald Decl. Ex. 2 ("Conway Aff.") at 2–3).  Dr. Conway opined that Dr. Carniciu's failure "to diagnose [plaintiff's] condition in a timely manner and obtain MRI imaging" departed "from good practice and deprived [plaintiff] of more rapid surgical intervention in the treatment of his hematoma and a reasonable chance for reversal of his neurological deficits."  (Id. at 3).

Further, had plaintiff been properly diagnosed, Dr. Conway believes:

> a herniated cervical disk or a posterior epidural hematoma, which turned out to the be the diagnosis, would have both been amenable to relatively uncomplicated surgery that could have been done that evening at Phelps, sparing [plaintiff] additional hours of compressive damage to delicate spinal cord tissue and giving him a chance for a better neurological outcome.

(Id. at 6–7).  Although Dr. Conway acknowledges that patients with plaintiff's injury tend to have poor prognoses, medical literature, says Dr. Conway, suggests surgery should be performed promptly to enable full or partial neurological recovery, that such recovery following prompt

surgery may occur in 24–36% of patients, and that, for these reasons, any delays caused by Dr. Carniciu could have contributed to plaintiff's ultimate paralysis.  (Id. at 7).[10]

Further, Dr. Murphy offered his opinion that Dr. Carniciu's differential diagnosis should have expanded beyond that of a herniated disc.  (Murphy Report at ECF 11).

Dr. Carniciu's experts take a different view.  Dr. Bradford Thompson, a Board-certified neurologist, opined that Dr. Carniciu "rendered timely and appropriate medical treatment completely in accordance with good and accepted standards in the field of neurology," and "the treatment she rendered did not cause [plaintiff's] paraplegia."  (Newman Decl. Ex. U ("Thompson Report") at ECF 21).  He noted Dr. Carniciu's diagnosis of "acute spinal cord trauma, potentially due to a herniated disc" "was a completely reasonable differential diagnosis," especially given the fact that a "spontaneous epidural hematoma is an uncommon neurological condition."  (Id. at 4).  Further, Dr. Bradford noted it was appropriate for Dr. Carniciu to defer to Dr. Lee about whether the surgery could have been performed at Phelps.

Dr. Ron Riesenburger, a neurosurgeon, shares Dr. Thompson's opinion.  Dr. Riesenburger noted that more than fifty percent of patients "remain paralyzed despite early

---

[10]     Dr. Conway cited Mukerji and Todd, Spinal Epidural Haematoma; Factors Influencing Outcome, BRITISH J. NEUROSURG. 2013, 27[6]:712–17, for the proposition that "[w]hile some of the medical literature indicates that surgical decompression of the cord within 12 hours of the onset of symptoms gives the best chance of recovery . . . that does not mean that it is acceptable to delay surgery until the 12 hour mark if decompression can be done reasonably sooner." (Conway Aff. at 7).

At his deposition, Dr. Conway testified the "general consensus is the two most important prognostic features are the severity of the deficit at onset and the speed to which surgical decompression is performed."  (Doc. #270 ("Corgan Decl.") Ex. 26 ("Conway Dep.") at 36).

Drs. Carniciu and Lee dispute Dr. Conway's findings given the medical literature on which Dr. Conway based such assertions.  (See, e.g., Doc. #268 ("Lee Mem.") at 21–22).

surgical intervention" when the patient, like plaintiff, has suffered the highest category of spinal injury.  (See Newman Decl. Ex. V ("Riesenburger Report") at ECF 28).

In addition, Dr. DiGiacinto—Dr. Berzon's medical expert—added that "Dr. Carniciu "acted in accordance with good and accepted practice and met the standard of care." (DiGiacinto Aff. ¶ 5).

Although Drs. Carniciu and Lee spill much ink attempting to discredit plaintiff's experts' opinions, the essence of plaintiff's experts' opinions is that Dr. Carniciu should not have made a treatment decision without reviewing MRI imaging, and, because MRI images were not taken until much later at WMC, plaintiff may have had a better outcome had the surgery been performed at Phelps, earlier.  (See Conway Aff. at 5–6).  This disputed opinion testimony presents a fact question for a jury, not the Court, to decide.  See Polanco v. Reed, 105 A.D.3d at 442.

Accordingly, Dr. Carniciu's motion for summary judgment must be denied.

3.    Dr. Lee

Dr. Lee first argues he cannot, as a matter of law, be held liable for medical malpractice because he did not have an established physician-patient relationship with plaintiff.

The Court disagrees.

"In determining whether an action sounds in medical malpractice or simple negligence, the critical question is the nature of the duty to the plaintiff which the defendant is alleged to have breached." La Russo v. St. George's Univ. Sch. of Med., 936 F. Supp. 2d 288, 304 (S.D.N.Y. 2013), aff'd, 747 F.3d 90 (2d Cir. 2014).  "When the duty arises from the physician-patient relationship or is substantially related to medical treatment, the breach gives rise to an action sounding in medical malpractice, not simple negligence." Id.  "[T]o maintain an action to

recover damages arising from medical malpractice, a doctor-patient relationship is necessary." Mejia v. Davis, 2018 WL 333829, at *10 (S.D.N.Y. Jan. 8, 2018).

The physician-patient relationship is "created when the professional services of a physician are rendered to and accepted by another person for the purposes of medical or surgical treatment," and may be based either on an express or implied contract.  Lee v. City of New York, 162 A.D.2d 34, 36 (2d Dep't 1990).  "[A] physician, by taking charge of a case, represents that he will use reasonable care and his best judgment in exercising his skills, and the law implies that he represents his skills to be such as are ordinarily possessed by physicians in the community." Id. at 35.  "[T]he dispositive factor in ascertaining" whether a physician-patient relationship exists is "the extent to which the defendant advised, and the plaintiff relied on advice about," a medical condition.  Burtman v. Brown, 945 N.Y.S.2d 673, 677 (1st Dep't 2012).

Here, the record indicates a material factual dispute regarding whether a physician-patient relationship existed between Dr. Lee and plaintiff.  Certain record evidence supports the existence of such relationship.  For example:  Dr. Berzon requested the clerk call Dr. Lee, the on-call neurosurgeon; Dr. Lee was consulted by Dr. Carniciu, the on-call neurologist, regarding plaintiff's diagnosis and the required surgery; Dr. Lee offered his opinion to Dr. Carniciu that, given plaintiff's diagnosis, Phelps was not capable of promptly performing the surgery; and Dr. Lee recommended to Dr. Carniciu that plaintiff be transferred to WMC.

Such conduct suggests Dr. Lee had a relationship with plaintiff, even if he did not directly examine plaintiff.  Moreover, the ultimate decision to transfer plaintiff to WMC, rather than perform surgery at Phelps, speaks to the heart of plaintiff's claim that delays in surgery negatively affected his prognosis.  In addition, plaintiff's experts perceived Dr. Lee as having

established a physician-patient relationship with plaintiff, as did Dr. Berzon's medical expert, Dr. DiGiacinto.  (See Conway Aff. at 3–6; Murphy Report at ECF 11; DiGiacinto Report ¶ 5).

It is also the case, however, that plaintiff did not know about Dr. Lee's involvement in his case, nor was plaintiff ever examined by Dr. Lee.  (See Pl. Dep. at 156).  Further, Dr. Jack Stern, a neurosurgeon retained by Dr. Lee, asserts that the telephone call between Drs. Carniciu and Lee was an "informal consult between physicians that did not rise to the level of physician-patient relationship."  (Corgan Decl. Ex. 1 ("Stern Aff.") ¶ 8).

For these reasons, there is a material factual dispute as to whether Dr. Lee and plaintiff had a physician-patient relationship.  Accordingly, summary judgment on this issue is not appropriate.

Next, Dr. Lee argues he is entitled to summary judgment because there is no genuine dispute of material fact as to whether his conduct fell below the standard of care or contributed to plaintiff's condition.

The Court disagrees.

Plaintiff's experts claim Dr. Lee's conduct fell below the standard of care and contributed to plaintiff's paralysis.  As discussed above, Dr. Conway testified that Dr. Lee's conduct significantly delayed plaintiff's surgery because, had Dr. Lee examined plaintiff, or had MRI images been conducted at Phelps, plaintiff's surgery "could have been performed the evening of July 8, 2015 at Phelps."  (Conway Aff. at 3).  Further, Dr. Conway claims it was a departure from good practice for Dr. Lee to not "examine [plaintiff]."  (Id.).  Dr. Murphy shared Dr.

Conway's opinion that Dr. Lee should have "examined [plaintiff], as was his obligation as the on-call Neurosurgeon, and demanded an MRI scan."  (Murphy Report at ECF 11).

However, Dr. Stern insists "Dr. Lee did not deviate from accepted standards of care" when he "did not go to the hospital to examine the patient," "insist on doing the MRI at Phelps," or participate in the "decision to transfer the patient to [WMC]."  (Stern Aff. ¶¶ 9, 12).  Further, it is Dr. Stern's opinion that plaintiff's surgery at WMC was timely and within accepted medical standards.

As such, there is a material factual dispute concerning Dr. Lee's conduct and whether it gives rise to medical malpractice liability.  Accordingly, Dr. Lee's motion for summary judgment must be denied.

III.    Expert Testimony

Drs. Lee and Carniciu request a hearing respecting the reliability and admissibility of plaintiff's experts' testimony they anticipate plaintiff will rely on at trial.  Indeed, Dr. Lee's expert, Dr. Stern, suggests Drs. Conway and Murphy "promote 'junk science' intended to mislead the jury."  (Stern Aff. ¶19).  Because the parties have not made a formal application to exclude experts and testimony, the Court declines to address this issue or schedule a hearing at this time.

**CONCLUSION**

The motions for summary judgment are DENIED.

Drs. Lee and Carniciu's request for a hearing to determine the reliability and admissibility of plaintiff's medical experts' testimony is DENIED WITHOUT PREJUDICE.

All counsel are directed to appear at a case management conference on September 16, 2020, at 2:30 p.m., at which time the Court expects to set a trial date and a schedule for pre-trial

submissions.  Counsel shall also be prepared to discuss whether this case should be referred to the magistrate judge or to a mediator for settlement purposes.

The September 16, 2020, conference will be conducted by telephone.  Counsel shall attend by calling the following number and entering the access code when requested:

**Dial-In Number:**      **(888) 363-4749 (toll free) or (215) 446-3662**

**Access Code:**         **1703567**

The Clerk is instructed to terminate the motions.  (Docs. ##257, 266, 271, 274).

Dated: August 7, 2020
       White Plains, NY

SO ORDERED:

Vincent L. Briccetti
United States District Judge